FRANCIS COMSTOCK, appellee, v. IOWA STATE HIGHWAY COMMISSION, appellant.

No. 50923.

(Reported in 121 N.W.2d 205)

1302

April 9, 1963.

Evan Hultman, Attorney General, C. J. Lyman, Special Assistant Attorney General, James E. Thomson, State Counsel, Ames, and Norelius & Norelius, of Denison, for appellant.

Raun & Franck, of Denison, and Clark & Clark, of Ames, for appellee.

SNELL, J.—Plaintiff, Francis Comstock, appealed to the district court from the assessment of damages for the taking by eminent domain of a part of his leasehold. The property appropriated was underlaid with sand and gravel subject to removal by plaintiff for processing and sale. From the award following trial by district court jury defendant, Iowa State Highway Commission, has appealed to us.

Plaintiff is a sand and gravel contractor. He owns and operates a sand and gravel pit and processing plant on 11.53 acres of land owned in fee just southwest of Denison. On this land he also has a shop, office, storage space for equipment and the stockpiling of material.

On December 20, 1954, plaintiff leased from the owner on a royalty basis of 20¢ per yard additional adjacent land. The lease was for not to exceed ten years. It provided for the mining, removal and sale "of such quantities of sand and gravel as may be found in and on all" of the described land. The leased land is adjacent to U. S. Highway No. 30. Under his lease plaintiff has been mining, removing, washing, grading and selling sand and gravel from the leased premises.

It should be kept in mind that the leasehold is not for ordinary use, cultivation or occupancy of the premises. It is a leasehold providing for the removal and depletion of physical property.

At the time of the condemnation and appropriation involved herein approximately three and one-half years of the lease remained.

In June 1961 defendant, Highway Commission, appropriated by condemnation 2.9 acres of the leasehold along Highway No. 30. The portion of the appropriated area underlaid with gravel consisted of 1.96 acres. Numerous tests indicated that there

were about 45,000 yards of gravel under this area. The various tests and estimates varied only slightly.

The district court jury fixed plaintiff's damage in the sum of $16,000. Defendant-commission, being unhappy about plaintiff's witnesses, the evidence received, the court's comments and instructions, and the amount of the award, has appealed.

Fourteen alleged errors are urged but many of them are related and will be considered together.

The record before us sets forth the evidence in considerable detail. The arguments include an extensive discussion of the evidence offered in support of plaintiff's case. The jury verdict was well within the evidence and testimony of plaintiff's witnesses and if the testimony was properly received the amount of the verdict may not be disturbed on appeal. The weight and credit of the testimony is for the jury and not for the trial court or for us.

Four witnesses, including the plaintiff, testified in behalf of plaintiff. Plaintiff testified as to his ownership, his operations, his experience and knowledge in the gravel business, and his estimate as to the value of his leasehold, both before and after condemnation.

▮ Another witness was a consulting engineer, a graduate of Iowa State University and a licensed civil engineer. The witness testified that he investigated and made a study of plaintiff's leasehold, was familiar with its operations and the kind and quality of gravel and sand produced. He testified as to the present price per cubic yard of the processed products and his calculations as to the cost of processing the sand and gravel for market. He arrived at a difference of $1.00 per cubic yard between the production cost, including the royalty payment, and the market price of the processed product. The witness, in addition to his professional training, had previously worked for the defendant, Highway Commission, and at the time of trial was employed as a consulting engineer. If his testimony was admissible as preliminary to the issue of plaintiff's damage there was no question about his qualification as a witness. He did not testify as to the amount of plaintiff's damage.

Another witness called by plaintiff was a graduate of the

State University of Iowa with a Bachelor's Degree in geology presently employed as a geologist for a construction company doing leasing and exploration work for sand, gravel and limestone. He had made an examination of the plaintiff's leasehold, had made borings, and ascertained the quality, quantity and character of the gravel being produced. He was familiar with the sale price of the product and with production costs, including the royalty payments, and the cost of removing the overburden. He testified as to the amount of plaintiff's damage and in arriving at his conclusion considered, among other matters, the amount of sand and gravel available for removal, all costs incident thereto and the market price of the processed product. If his approach to the problem was proper there is no question about his qualification as a witness.

The third expert witness called by plaintiff was a professional farm manager and appraiser engaged in such work since 1935 and with experience in every county in the state. He familiarized himself with the plaintiff's leasehold, he inspected the land, the material produced, the amount of overburden and the depth of gravel deposits, the cost of production and the general selling price, and the amount of gravel available for excavation. Based upon all of the elements considered and the various approaches by appraisers, he gave his opinion as to the before and after value of the plaintiff's leasehold. He, too, was a qualified witness if his approach to the problem was from a sound premise.

Five witnesses testified for the defendant. They consisted of the district materials engineer for the defendant-commission; a witness from Council Bluffs, who was in the general real-estate and appraisal business; a banker from an adjoining county, experienced with real-estate values; a farmer with a small gravel pit on his farm; and a geologist with the defendant-commission.

As is usual in such cases, the difference between the evidence as to value offered by the plaintiff and by the defendant was great.

Of the fourteen alleged errors relied upon for reversal, eleven relate to the qualification and testimony of plaintiff's witnesses. Of the eleven, five challenge the foundation from

which plaintiff's witnesses expressed valuation opinions, and six relate to the inclusion and consideration of production costs and market price of the finished product in arriving at the witness' opinion.

I. Defendant challenges the qualification of plaintiff's witnesses and the foundation from which they expressed their opinions.

Each of plaintiff's witnesses testified as to his experience, training, background, method of approach to the problem and the elements considered. Each explained how he arrived at his conclusion.

The record shows that each was especially well qualified in his respective field.

■■ It is the uniform rule that the receipt of opinion evidence, whether lay or expert, and the extent to which it will be received in any particular case, is a matter resting largely in the administrative discretion of the trial court. Appellate courts are loath to interfere with such discretion unless manifestly abused to the prejudice of the complaining party. Grismore v. Consolidated Products Co., 232 Iowa 328, 342, 5 N.W.2d 646; Ruth v. O'Neill, 245 Iowa 1158, 1171, 66 N.W.2d 44; McBeth v. Merchants Motor Freight, Inc., 248 Iowa 320, 324, 79 N.W.2d 303. There was no error in connection with the qualification of plaintiff's witnesses.

II. The real issue as to the evidence is the approach from which plaintiff's witnesses considered the problem and the controlling elements in their conclusions. Defendant contends that each witness was using a unit rule and multiplied the yards of gravel available by $1.00 per yard profit.

There is a rather startling similarity between the conclusions of the witnesses and computations under the unit rule. Two of plaintiff's witnesses fixed the damage at $45,000 and one at $48,000.

■■ Plaintiff's witnesses deny the use of the unit rule but admit that quantities, costs and sale prices were considered. They say the similarity is a mere coincidence. We agree. In Ranck v. The City of Cedar Rapids, 134 Iowa 563, 566, 111 N.W.

1027, it was held proper for an owner to prove the presence and value of undeveloped mineral deposits in the land taken.

██ As hereinafter discussed the so-called unit rule is not the measure of damage. Neither is the contemplated profit from the use of real estate. All of the various factors, however, may be considered in determining before and after value. Multiplying production units by the market price per unit does not fix value but the producing ability of real estate has a definite bearing on value. Anticipated profit has too many variables including managerial skill to be the sole basis for fixing value, but the hope for gain is a motivating element in the purchase of commercial property. Income and profit are not necessarily the same.

Here the leasehold was not for ordinary use on a recurring basis. Plaintiff's right and his only right was to exploit, mine, deplete and sell the actual physical property constituting a part of the real estate. If he had been permitted to continue under his lease 45,000 yards of the real estate would have been removed and a hole in the ground would have remained. What plaintiff actually owned was the right to remove and sell gravel. The value of what he had to sell, less the cost incident thereto, would certainly be indicative of value. It might be the most important indicia in the case at bar because when plaintiff finished removing the gravel nothing of value would be left. To a man in the gravel business one of the most important considerations in estimating the value of a gravel pit would be the amount and value of salable gravel and the cost of production. The value of the rights to a large available supply of gravel might be high. If filled with water a worked out pit might be used for swimming or fishing, but otherwise it would be worthless.

██ The value of a removable product resulting in complete depletion of value is proper evidence in proving before and after value. It is not improper just because the result is the same as the application of the unit rule.

The evidence indicated a ready market at stable prices and constant costs. Such things cannot be projected into the distant future, but here the witnesses were dealing with only three and one-half years and what they considered the foreseeable future.

The evidence indicated without dispute that within the time of his lease plaintiff could remove and either sell or stockpile all the gravel from the appropriated property. The operation was a comparatively short-term venture with prices and costs sufficiently stable for computation of present value.

■ It has been held "with remarkable unanimity" that " 'profits of a business are too uncertain, and depend on too many contingencies to safely be accepted as any evidence of the usable value of the property upon which the business is carried on.' " Wilson v. Iowa State Highway Commission, 249 Iowa 994, 1006, 90 N.W.2d 161, 169.

■ Here we are not dealing with profit from the use of the property. Plaintiff naturally hopes to profit and the record shows that he sells his product above his cost. He is not, however, making a profit from the normal use of a leasehold. When plaintiff removes the gravel from the leasehold the corpus of the estate is consumed by its use resulting in complete depletion. The sale price of the materials so removed, less the cost of production, is certainly germane to the question of before and after value.

■ The basic rule as to the measure of damage is constant. Where there is a partial taking the measure of damage is the difference in value before and after the taking. Nedrow v. Michigan-Wisconsin Pipe Line Co., 245 Iowa 763, 769, 61 N.W.2d 687.

■ When the word "value" is applied to property and no qualification is expressed or implied it means the price the property will command in the market. In re Estate of McGhee v. State, 105 Iowa 9, 15, 74 N.W. 695; Skaff v. City of Sioux City, 255 Iowa ......, 120 N.W.2d 439.

■ Since the decision in Redfield v. Iowa State Highway Commission, 251 Iowa 332, 99 N.W.2d 413, 85 A. L. R.2d 96, evidence of comparable sales has been received as substantive proof of the value of the property being taken.

■ Where there are no comparables, no market and no general buying and selling of the kind of property in question resort must be had to other methods of approach and intrinsic or actual value may be shown. 29 C. J. S., Eminent Domain,

section 136; Nedrow v. Michigan-Wisconsin Pipe Line Co., supra, on page 768 of 245 Iowa.

In the case at bar there was no evidence of the market value of real estate comprising part of a gravel leasehold. Resort to evidence of intrinsic or actual value was not only proper but necessary.

III. Nedrow v. Michigan-Wisconsin Pipe Line Co., supra, involved damages for the condemnation of a right-of-way across land leased for a limestone quarry. Plaintiffs were the owners of the fee as distinguished from a leasehold for three and one-half years. Plaintiffs' land was underlaid with limestone. The land was subject to a royalty lease paying plaintiffs on a tonnage basis. The trial court found that plaintiffs' land had no ascertainable market value. The before and after rule was discarded by the trial court. The unit rule was used and royalty income was capitalized. The ruling required a finding as to market conditions and production costs that would prevail into the future for at least 46 years. The case was reversed because of the errors in determining damage. The rules were considered and discussed. The case at bar is factually distinguishable from the Nedrow case, but what was said is applicable here. We quote:

"The foundation finding for the damage award in condemnation is the value of the property before condemnation. If it can be established that there is a market for the property, by evidence of a general buying and selling of that kind of property, the first finding will be the market value. But if the nature of the property be such that no market for that kind of property can be ascertained or established, the primary finding will be intrinsic or actual value of the property. Once the value is found before condemnation, either market or actual as the case may be, the next question is the value after condemnation. If the whole of the property is taken the first finding of value is the measure of recovery. If part of the property is taken the measure of recovery is the difference between the finding of value of the whole property before condemnation and the finding of value of the remaining property after condemnation. * * * But the point we wish to emphasize in this case, where

there was a partial taking, is that the measurement of damages must start with a finding of value of the property, either market or actual, before condemnation. The ultimate determination of the amount of damages must build on the foundation of a formed judgment that, before condemnation, the whole of plaintiffs' farm was worth on the market, or actually to plaintiffs, so many dollars. We can accept the trial court's finding that market value was not ascertainable and go forward with the quest for actual value. That determination must be made at the very threshold of the case, for the condemner is never required to pay more than the full value of condemnee's land, and, if the taking is less than the whole, the condemner pays that much less than the full value as the value of the part not taken bears to the value of the whole.

"The error in this case lies in the trial court's finding, or it might be said lack of finding, of the value of plaintiffs' farm before condemnation. Great liberality is usually allowed in the introduction of evidence of items and elements which can and should be considered on the question of value of the property. But all of the cases caution against the use of these items and elements for anything more than permissible considerations on the question of value." (Pages 768 and 769 of 245 Iowa)

"One of the items enumerated in the Ranck opinion (at page 566 of 134 Iowa) as being proper proof by a landowner to support value estimates is 'the presence and value of undeveloped mineral deposits in the land taken, Doud v. Railroad Co., 76 Iowa 438.' * * *

"In 156 A. L. R. 1416, 1418, the annotator gives the following as the basic rule in condemnation as to valuation of land containing minerals:

" 'With remarkable unanimity the courts hold that in determining the compensation in eminent domain proceedings for the land to be condemned, the existence of valuable mineral deposits in the land taken constitutes an element which may be taken into consideration if and in so far as it influences the market value of the land. * * *.' " (Page 770)

"In 156 A. L. R. 1423 the rule is stated: 'It is a general rule that in ascertaining the amount of compensation to be

awarded for taking property containing mineral deposits in eminent domain, the amount of the mineral deposits cannot be estimated and then be multiplied by a fixed price per unit. The reason for this rule is said to be that the estimate as to the quantity and quality of the minerals in the land constitutes mere speculation and that, furthermore, even if such amount could be exactly ascertained, the costs of mining and the profits made therefrom would still be uncertain, since the contingencies of the business could not be estimated with any fair degree of certainty.' " (Page 771)

" 'Fixing just compensation for land taken by multiplying the number of cubic feet or yards or tons by a given price per unit has met with almost uniform disapproval of the courts. This is true because such valuation involves all of the unknown and uncertain elements which enter into the operation of the business of producing and marketing the product. It assumes not only the existence, but the continued existence of a stable demand at a stable price.' " (Page 773)

"Then the court seemed to feel that his finding that the farm had no ascertainable market value relieved him from all duty to find any value at all and opened the door for the application of a measure of damages based on the loss in terms of royalty the plaintiffs would sustain if the rock which was rendered unquarriable by the presence of the pipe line actually were quarried and sold. In other words, the trial court made the mineral deposit in the land taken the measure of damages. This is definitely not the law under all of the authorities." (Page 775)

"The plaintiffs seem to argue this right to employ a different measure flows from the trial court's finding that the plaintiffs' land had no ascertainable market value—that in the inquiry for actual value, the court is free to discard the before-and-after rule, and apply a different measure for awarding damages such as the capitalization of income that will or might be lost by reason of the taking. The contention will not stand examination. It requires making constant, factors, which the history of private business in this country shows are variable. As applied in the instant case the measure the trial court em-

ployed required a finding as to market conditions and production costs that will prevail on into the future for at least forty-six years." (Page 776)

"The present quarry operator has a right to continue operations until 1955 but he is under no duty to do so. We can assume no quarry operator will continue to remove rock and pay plaintiffs' royalty if the operation becomes unprofitable. In a sense the plaintiffs are in business with the quarryman for they will receive royalties according to the business fortune of the operator. The limestone vein does not stop with plaintiffs' line fence. The record shows by plaintiffs' witnesses that lime rock is plentiful in this area for at least a couple of miles around plaintiffs' farm and there are mineral leases on land adjoining plaintiffs'. The quarryman testified there are five quarries operating which compete with him in his four-county market area. This record shows the market for the quarry product is in a perilous position. To a large extent it depends on a government subsidy to farmers for the agricultural limestone and government appropriations for roads for the road rock." (Page 777)

In the Nedrow case there was no attempt to determine a before and after value. Although there was no certainty that the royalty income would continue its full possibility for 46 years was capitalized. In the case before us an entirely different situation prevails. The witnesses testified to before and after values. They said the market was stable. The time was short. Plaintiff could remove all the gravel within the period of his lease. The court instructed on the before and after values. The jury verdict clearly shows that there was no capitalization of future income. The jury did not base its award on either computed or commuted value of mineral deposits. Nothing but similarity of estimates indicates the use of the unit rule by witnesses and the jury did not follow any unit rule in arriving at its verdict. The purely speculative matters in the Nedrow case do not appear here.

Korf v. Fleming, 239 Iowa 501, 32 N.W.2d 85, 3 A. L. R.2d 270, involved condemnation for right-of-way and separate damages to the fee and leasehold. The property involved was farm

land and crops but much that is said relative to leaseholds is appropriate here. We quote from the Iowa Report:

" 'It is usually assumed that this market value is equal to the excess of the rental value over the rent reserved.'

"Where the whole property is taken and the leasehold is destroyed the measure of damage has been variously stated as the rental value over the rent reserved * * *.

"The same rule applies in the condemnation of a right of way over leased premises and only a part of the leasehold is taken." (Page 517)

" 'It would seem that a lease might well be held to fall within the class of property not commonly bought and sold, and that consequently the intrinsic value, or the value to the owner, might be taken as the best and only available test of market value.' " (Page 519)

"Defendants argue that estimated profits must not be considered. We have no quarrel with this rule. Here the estimated profits were not in the distant future but were almost in the present and based upon existing conditions and farm returns of the past two years."

" 'Income is an element of market value. "The value of property, generally speaking, is determined by its productiveness—the profits which its use brings to the owner." * * * "The net revenue arising from the use of land may be shown on an issue as to value, although it does not furnish a conclusive test." ' " (Page 520)

In referring to the tenant the court commented that he had a good lease and said, "He was entitled to the benefit of his bargain. * * *.These various items and elements are not to be considered as specific amounts of damage to be added together in computing the loss, but are simply to be considered in arriving at the fair and reasonable value of the leasehold over and above the rent reserved in the lease both before and after the appropriation of the right of way." (Page 521)

In the case before us the trial court in instructing the jury carefully set forth the measure of damage and the elements to be considered in determining value and admonished against the use of any unit rule in determining damage.

In Instruction No. 10 the court told the jury that the just compensation to be paid plaintiff was the difference between the reasonable market value of the leasehold interest before the taking and after the taking.

In Instruction No. 11, mentioning the leasehold interest underlaid with gravel, its value on the open market, and the evidence of buying and selling, the jury was told that these items were not to be considered as in themselves affording the basis or measure of recovery, but might be considered as explaining and supporting the estimates of market values before and after the taking.

In Instruction No. 12 the jury was told that the various terms relating to value as used in the trial meant the fair and reasonable value of the leasehold as it existed before the condemnation and its fair and reasonable value as it existed immediately thereafter.

In Instruction No. 13 the jury was instructed against consideration of matters that were fanciful, imaginary, speculative or contingent, even though mentioned or testified to by witnesses.

Instruction No. 22 specifically warned against a unit rule as follows:

"There is evidence in this case as to certain net income derived from Plaintiff's operation of his leasehold in the past. You are instructed that you are not to use such evidence as the measure of Plaintiff's damages; but you may consider such evidence only to the extent that you find that it does provide support, if any, for the estimates given herein as to reasonable value of the Plaintiff's leasehold before and after condemnation.

"Further and in ascertaining the amount of the award to the Plaintiff herein, you are instructed that it would be improper for you under the law to base your decision on the amount of sand or gravel being taken multiplied by a fixed price per unit of such sand or gravel."

It would thus appear that the instructions to the jury carefully guarded against the use of the unit rule in determining plaintiff's damage.

We adhere to the principle that the unit rule is not the measure of damage, but the use of pencil and paper

and computation is not proof of impropriety. The amount and value of recoverable mineral deposits are not only proper but necessary elements to be considered in determining before and after value.

IV. Defendant's counsel in cross-examination of plaintiff inquired into the purchase by plaintiff of adjoining land and the price paid. This land was part of plaintiff's operation but was not involved in the condemnation. The deed showing the purchase and the consideration was offered in evidence by defendant. Objection was made and overruled. The court held that the consideration was already in the record and the objection too late. In ruling the court commented "Members of the jury, we decide the case with gravel. Land value has nothing to do with it."

Exceptions to the comment were taken by defendant on the ground that the value of the leasehold cannot exceed the value of the land itself.

The court's comment was premature and somewhat inappropriate at the time, but a study of the record shows no prejudice. A statement of the issues for determination by the jury is more appropriate in the final instructions than in intermediate or interlocutory comments. However, an indication of what issues will be submitted frequently appears from rulings on evidence.

The consideration paid for adjoining land was in evidence but there was no evidence that the commercially available gravel per acre was comparable to the condemned tract.

Without a showing of comparability the value of other land did not have much to do with the issue on trial.

Defendant supports the exceptions on the theory that the value of a leasehold cannot exceed the value of the land itself. The law of Iowa does not so hold.

In Wilson v. Fleming, 239 Iowa 718, 734, 735, 31 N.W.2d 393, we approved the rule that where the damage to the owner and lessee might be separately assessed the condemnor might be required to pay the sum of such damages even though in excess of the damage to the undivided whole interest.

Here there was no evidence of comparable sales. There

was no issue as to the value of the fee or of the land distinct from the leasehold. The sole issue was the damage to the leasehold. The value of an adjoining fee was not a limitation on the value of plaintiff's leasehold.

The total value of undeveloped real estate might be less than the developed value of a leasehold. The sale price of adjoining land was in evidence but land value as such was not the issue.

A leasehold interest is property and when taken in the exercise of eminent domain is compensable. Korf v. Fleming, supra; Batcheller v. Iowa State Highway Commission, 251 Iowa 364, 368, 369, 101 N.W.2d 30; Wicks v. Iowa State Highway Commission, 254 Iowa 998, 1007, 119 N.W.2d 781, 787. The issue in the case at bar was the compensation due the owner of the leasehold and not the value of the land. The interests of the lessor and lessee were several and not joint. An award to one would in no manner affect or prejudice the other's rights. Batcheller v. Iowa State Highway Commission, supra.

The comment of the trial court was without prejudice.

V. The first paragraph of Instruction No. 11 was as follows:

"Ordinarily market value is the criterion, but in the case of a leasehold interest in land underlayed with gravel such as we have here, value on the open market, or evidence of buying and selling of such a leasehold may not be possible of ascertainment, and the primary finding will be the intrinsic or actual value to an owner. Evidence has been admitted as proper items for consideration by the jury of the presence of gravel in substantial quantities in the land comprising Plaintiff's leasehold, including the portion thereof taken by the Defendant for highway purposes. You are instructed that these items are not to be considered as in themselves affording a basis or measure of recovery, but as explaining and supporting the estimates made of market values of the leasehold as a whole before and after the taking."

Defendant complains about the use of the words "intrinsic or actual value to an owner" as unclear and lacking in harmony

with the last sentence of the paragraph. The objection is hyper-critical.

What constitutes an intrinsic value is rather nebulous but when we reject the mathematical certainty of the unit rule we must permit opinions based in part on elements impossible of exact calculation. The instruction did not permit an award based on sentiment or reasons peculiar to a particular owner. It permitted an award based on actual value to an owner.

The language of the instruction finds support in Korf v. Fleming, supra, quoted above in Division III, and in Nedrow v. Michigan-Wisconsin Pipe Line Co., supra, quoted above in Division III.

We find no error in the instruction.

VI. Defendant claims the alleged errors were of such a cumulative nature as to deprive defendant of a fair and proper trial. The various matters urged were separately numbered and argued but were all within the problems we have considered. We do not find that there were such errors as to deprive defendant of a fair trial.

Many of the problems arising in the trial court were diffi-cult and much of the testimony was close to the line dividing the proper from the improper, but we do not find that the opinions of the witnesses or the verdict of the jury were based on improper considerations. For the property taken the award seems large but it was only slightly more than one third of the amount estimated by plaintiff's witnesses. The determination of the amount of damages is what juries are for.

The case is—Affirmed.

All JUSTICES concur.